1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

EASTERN DISTRICT OF CALIFORNIA

10
11

CANDACE KESSLER,                                    Case No.  1:15-cv-00080-SKO

12

Plaintiff,

**ORDER ON PLAINTIFF'S SOCIAL**
**SECURITY APPEAL**

13

v.

14

CAROLYN W. COLVIN,

15

Acting Commissioner of Social Security,

16

Defendant.

17
18
19

**I.    INTRODUCTION**

20

Plaintiff, Candace Kessler ("Plaintiff"), seeks judicial review of a final decision of the

21

Commissioner of Social Security (the "Commissioner") denying her application for Disabled

22

Widow's Insurance ("DWB") benefits pursuant to Title II of the Social Security Act.  42 U.S.C.

23

§ 402(g)(1).[1]    The matter is currently before the Court on the parties' briefs, which were

24

submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate

25

Judge.[2]

26

27

[1]    As applicable here, widow's insurance benefits are a survivor's benefit based on the widow's disability and the deceased person's insured status. 42 U.S.C. § 402(e)(1)(B)(ii). The widow need not be an insured in her own right, but she does need to be "disabled."  *See Aarestad v. Comm'r of Soc. Sec. Admin.*, 450 F. App'x 603, 604 (9th Cir. 2011).

28

[2]    The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 7; 10.)

## II.   FACTUAL BACKGROUND

Plaintiff was born on May 5, 1960, and alleges disability beginning on July 20, 2007. (Administrative Record ("AR") 19-28.)  Plaintiff claims she is disabled due to degenerative disc disease, arthritis, high blood pressure, depression, bone spurs in her spine, and hip and neck pain. (*See* AR 256.)

**A.     Relevant Medical Evidence**

**1.      Dr. Aggarwal's Records**

On January 10, 2007, Plaintiff was seen by Dr. Ajay Aggarwal, M.D., for neck pain, low back pain, and bilateral hip pain and reported that her "hips feel like they pop out of place." (AR 340.)  Plaintiff reported her pain began about five to seven years prior, it increases when sitting, bending, and lifting, and on some days "when she wakes up [she] can't hardly walk." (AR 340.)  She self-rated her "stabbing/aching" and "radiating" pain as a 9/10.  (AR 340.) Plaintiff's treatment plan was determined to be managed by medications only and she was prescribed Norco.  (AR 341; 497.)  On February 7, 2007, Plaintiff was seen for neck pain and a refill of her Norco prescription and reported her "pain med[ication] takes the edge off" her "constant pain."  (AR 338.)

On March 7, 2007, Plaintiff was seen by Dr. Aggarwal for neck and bilateral hip pain that had increased to a 9/10 and reported that she had run out of medication due to the increased pain. (AR 336.)  Her prescription for Norco was refilled and no new pain was noted.  (AR 336.)  On May 4, June 29, July 27 and August 27, 2007, Plaintiff was seen for neck and hip pain self-rated as a 7/10 and a refill on her medication, and no new pain was noted.  (AR 329-34.)  On October 24, 2007, Plaintiff was seen for neck and hip pain self-rated as an 8-9/10 and a refill of her medication, and no new pain was noted.  (AR 327.)  On January 16, 2008, Plaintiff was seen for neck pain self-rated as a 6/10 and no new pain was noted.  (AR 321.)  On February 13, 2008, Plaintiff self-rated her neck pain as an 8/10 and received medication refills of Norco and Flexeril. (AR 318-20.)  On March 12, April 9, May 7, June 4 and August 27, 2008, Plaintiff was seen for neck pain self-rated as a 6-7/10 and a refill of her pain prescription.  (AR 316; 366; 368; 370; 372.)  On November 21, 2008, Plaintiff was seen for neck pain self-rated as an 8/10 and a refill of

her Hydrocodone prescription.  (AR 364.)

On February 13, 2009, Dr. Aggarwal saw Plaintiff for neck pain self-rated as a 6/10 and ordered imaging of Plaintiff's cervical spine.  (AR 319.)  On March 13, 2009, Plaintiff was seen for her neck pain with radiculopathy and refill of her Norco prescription, and tenderness, spasms, and restricted range of motion were noted.  (AR 359.)  On April 21, 2009, magnetic resonance imaging ("MRI") of Plaintiff's lumbar spine revealed moderate levo scoliosis and exaggerated lumbar lordosis, an adequately-sized spinal canal and normally-sized conus-cauda equine, unremarkable retroperitoneum,  and more specifically

- T12-L1: moderate degenerative disc disease with narrowed disc space, prominent osteophytes ventrally.  Bulging disc noted both ventrally and dorsally with diffuse thecal sac compression.

- L1-L2: mild facet arthritis.

- L2-L3: minimal degenerative changes in the vertebral margins.  Bilateral facet arthritis with fluid in facet joints.

- L3-L4: mild spinal and right foraminal stenosis secondary to hypertropic I lateral facet arthritis, minimal spondylolisthesis, slightly narrowed disc space with disc degeneration and minimal disc bulge causing circumferential thecal sac compression.

- L4-L5: mild spinal and right foraminal stenosis due to hypertrophic bilateral facet arthritis, grade 1 spondylolisthesis, narrowed disc space with prominent disc bulge causing circumferential thecal sac compression and mild right nerve compression.  Marrow edema in the pedicles of L5 noted.

- L5-S1: moderate degenerative disc disease, facet arthritis, bulging disc/or osteophytes protruding throughout the spinal canal causing mild left foraminal stenosis without significant nerve compression.

(AR 343-44.)  An MRI of the cervical spine revealed no compression fracture or abnormal marrow changes, normal anatomy at the cranio-cervical junction, an adequately sized bony spinal canal, and normal intrinsic cervical cord pathology, and more specifically

- C2-C3: bilateral facet arthritis.

- C3-C4: minimal spondylolisthesis, bilateral facet arthritis, minimal disc bulge. Minimal pressure is suspected on the left nerve.

- C4-C5: moderate degenerative disc disease with narrowed disc space, osteophytes and bulging disc both ventrally and dorsally, facet arthritis causing spinal and foraminal stenosis with bilateral nerve compression.  No significant cord compression.  Abnormal marrow intensity noted consistent with stress induced marrow edema.

- C5-C6: moderate degenerative disc disease, mild facet arthritis, osteophytes/disc complex noted both ventrally and dorsally encroaching throughout the spinal canal causing left lateral recess and foraminal stenosis with moderate left nerve compression and minimal left side cord compression. Degenerative marrow signal noted.
- C6-C7: moderate degenerative disc disease, mild facet arthritis. Osteophytes/disc complex noted both ventrally and dorsally encroaching into the spinal canal and neural foramina without causing significant cord or nerve compression.
- C7-T1: bulging disc and facet arthritis.

(AR 346-47.)  The interpreting physician concluded that the MRI demonstrated degenerative disc disease and facet arthritis causing spinal/foraminal stenosis at C4-C5, C5-C6, and C6-C7 levels, bilateral nerve compression at C4-C5, left nerve compression at C5-C6, and minimal left side cord compression at C5-C6, and that the abnormal marrow signal in C4, C5, C6, and C7 vertebral bodies was due to a combination of stress induced marrow edema and reactive degenerative marrow changes.  (AR 346.)  On May 8, 2009, Dr. Aggarwal saw Plaintiff to discuss the MRI reports and refill her pain medication, noting on examination tenderness and spasms, limited range of motion, and 4/5 strength.  (AR 356.)

On June 26, 2009, Dr. Aggarwal performed a cervical transforaminal epidural steroid injection at Plaintiff's C5-C6 and C6-C7 level vertebra.  (AR 347-49.)  On August 12, 2009, Plaintiff was seen for her ongoing cervical and lumbar spine pain, self-rated as an 8/10, and noted she had not continued with the epidural steroid injection.  (AR 352-54.)  On examination of Plaintiff's cervical spine, Dr. Aggarwal noted palpable muscle spasms, tenderness of the neck, restricted range of motion, 4/5 strength and 3/4 reflex in bilateral upper extremities.  (AR 352; 354.)  On examination of Plaintiff's lumbar spine, Dr. Aggarwal noted palpable muscle spasms, tenderness of the lower back, restricted range of motion, 4/5 strength in the lower extremities, and 3/4 reflexes to bilateral patella and ankle jerk, and observed that Plaintiff could walk heel to toe with increased pressure on her bilateral hips.  (AR 352; 354.)  Dr. Aggarwal also noted that Plaintiff "does not want to do any [physical therapy]."  (AR 355.)  On November 21, 2009, Dr. Aggarwal recommended another cervical MRI but Plaintiff demurred, stating she wanted to wait to do it until after the first of the new year. (AR 325.)  On December 19, 2009, Plaintiff was seen

4

1   for neck and hip pain self-rated as a 6/10 and a medication refill.  (AR 323.)

2   **2.      University of Texas Medical Records**

3   On August 21, 2007, Dr. Kimberley Bryant, D.O., saw Plaintiff to establish care, and

4   Plaintiff reported she had run out of antihypertensive medication and was splitting her boyfriend's

5   medication instead.  (AR 401.)  On examination, Plaintiff denied gait disturbance and muscle pain

6   but noted she suffers from occasional neck pain for which she takes Norco.  (AR 402.)  On March

7   28, 2008, Plaintiff was seen by Dr. Bryant and reported she had been out of her medication for

8   about two weeks.  (AR 392.)  Dr. Bryant noted Plaintiff's hypertension was poorly controlled and

9   Plaintiff was poorly compliant with her medications.  (AR 393.)  On December 30, 2008, Plaintiff

10  was seen for a refill of her hypertension and pain medications.  (AR 387-88.)  On April 7, 2009,

11  Plaintiff did not keep her appointment.  (AR 384.)  On September 11, 2009, Plaintiff was seen for

12  cervical pain, reporting that her pain was so intense she had to take Norco every two hours and it

13  was not working, that she was going through a "very stressful time" and that her "depression is

14  overshadowing everything else in her life currently," and that her husband had just been diagnosed

15  with cancer.  (AR 377.)  She was referred to a pain clinic and her Norco prescription was refilled.

16  (AR 378.)  On October 13, 2009, Plaintiff did not keep her appointment.  (AR 374.)

17  **3.      Dr. Ossowski's Records**

18  On September 7, 2010, Plaintiff was seen by Dr. Maciej Ossowski, M.D., for hypertension

19  and back pain and noted to have nerve damage, bone spurs, and pain in her left hip.  (AR 429.)

20  Plaintiff saw Dr. Ossowski from 2010 through 2012, and though his notes are largely illegible, it

21  appears Plaintiff consistently complained of pain.  (*See* AR 429 (reporting back and neck pain

22  self-rated as a 6/10); 435 (back pain self-rated as a 7/10); 439 (reporting lower back, neck, and left

23  hip pain); 481 (self-rating pain as a 6-8/10 and reporting insomnia due to pain).)   Abnormal

24  symptoms were repeatedly noted in Plaintiff's back, neck, and left hip, but no descriptions were

25  included.  (*See* AR 429; 435; 439; 442; 451; 455; 460; 463; 467; 470; 473; 476; 481; 484.)

26  In January 2011, Plaintiff's back and neck pain were "moderately controlled" by Norco,

27  though both continued to worsen and her hip pain increased and was accompanied by pain

28  radiation and numbness.  (AR 444 (describing tenderness at Plaintiff's left hip).)   In February

5

2011, Plaintiff reported she would try homeopathic medications because other options were too expensive and reported pain in her upper extremities.  (AR 448.)  On examination, she had abnormal findings in her neck, including decreased range of motion with "lateral, rotational, forward bend, flexion & ext[ension]" and diminished strength on her left "with radiation of pain to left shoulder & arm."  (AR 448.)  The doctor refilled Plaintiff's Norco prescription and noted Plaintiff would "consider morphine sulfate."  (AR 449.)

On March 7, 2012, Dr. Ossowski ordered imaging of Plaintiff's cervical spine which revealed moderately severe degenerative discopathy at levels C4-C5, C5-C6, and C6-C7, cervical spasm, and moderate to moderately-severe diffuse facet and uncovertebral arthropathy with diffuse neural foraminal impingement.  (AR 416; 488.)

### 4.    Examining Physicians

On August 15, 2012, Plaintiff was seen by Dr. David Dahl, Ph.D., for a comprehensive psychiatric evaluation.  (AR 418-23.)  Plaintiff drove herself and was nicely groomed and appropriately attired.  (AR 418.)  Plaintiff reported that she had become depressed before her husband had passed away in 2003 and she had taken anti-depression and anti-anxiety medications until 2009 to 2010 when she could no longer afford them.  (AR 418.)  Plaintiff reported having a good relationship with her two grown sons, living with a friend, having friends, and getting along with these people.  (AR 419.)  Plaintiff has no high school diploma, but received good grades, had no academic problems, and had no behavioral problems.  (AR 419.)  She previously worked as a florist for a grocery chain from 1999-2006 and then again for about three to five weeks in 2007.  (AR 420.)  Plaintiff reported on an average day

> . . . she gets up around between 6 o'clock and 9 o'clock in the morning and she goes to bed around 11 or 12.  She watches television, does what she can to straighten up the house, watches television, sprinkles a small grass area in front of the house.  Occasionally she cooks simple meals.  She does her grocery shopping quickly.  She stated she cannot clean in depth like she once did.  She states she loves to cook, bake and can jellies and jams but she cannot any longer and she is capable of looking after her own self-care.  She relates well to strangers.  She does not know how to use the internet.  She has difficulty walking.  She can drive a car and take a bus, find directions, visit with friends and with family, read and discuss the news.

1  (AR 420.)  Plaintiff walked with a slow gait and stated she can walk about 15 minutes slowly.

2  (AR 420.)  Dr. Dahl noted that Plaintiff's depression was treatable and could be expected to

3  improve in 12 months with appropriate treatment.  (AR 422.)  Dr. Dahl concluded Plaintiff is able

4  to perform simple, repetitive and detailed tasks without impairment; mildly impaired in her ability

5  to interact with peers, family, coworkers and the public and to maintain regular attendance;

6  impaired in her ability to perform work activities without accommodation; and moderately

7  impaired in her ability to complete a normal workday without interruption and deal with

8  workplace stressors.  (AR 422-23.)

9      On August 22, 2012, Plaintiff was seen by Dr. Fariba Vesali, M.D., for a comprehensive

10  orthopedic evaluation.  (AR 424-27.)  Plaintiff reported neck pain lasting years, occasional left hip

11  pain and mid- and low-back pain, a neck injection with some improvement, and chiropractic

12  treatment with no improvement.  (AR 424.)  Plaintiff noted that cleaning and vacuuming the house

13  exacerbates her neck pain, bending, stooping, twisting, and turning exacerbate her low back pain,

14  and rest, changing position, and pain medication relieve her pain.  (AR 424.)  Plaintiff lives with a

15  roommate, drives a car, does the grocery shopping, cooks occasionally, and does dishes and

16  laundry slowly.  (AR 424.)

17      On examination, Plaintiff was alert and did not have any difficulties taking off her sandals

18  or getting on and off the examination table.  (AR 425.)  She walked with a normal gait and her toe

19  walk and heel walk were both normal.  (AR 425.)  Plaintiff had pain on range of motion in both

20  the lumbar and cervical regions and pain in the popliteal fossa with radiation to the buttock during

21  the straight leg raising test.  (AR 425-26.)  Plaintiff had 5/5 bilateral upper and lower extremity

22  strength and normal muscle bulk and tone and tingling below the left knee on sensory exam.

23  (AR 426.)  Dr. Vesali concluded Plaintiff had degenerative disc disease of the cervical spine,

24  possible degenerative disc disease of the lumbar spine, and left femur greater trochanter bursitis.

25  (AR 426.)  Dr. Vesali assessed Plaintiff would be able to walk, stand, and sit six hours in an eight-

26  hour day with normal breaks, would not need an assistive device for ambulation, could lift/carry

27  20 pounds occasionally and 10 pounds frequently, and was capable of frequent postural and

28  manipulative activities.  (AR 427.)

### 5. Consultative Physicians

On November 28, 2012, agency consultative physician Dr. R. Fast, M.D., reviewed the medical evidence and agreed that Plaintiff was capable of light work. (AR 62.) Dr. Fast opined Plaintiff would be limited to lifting or carrying 10 pounds frequently and 20 pounds occasionally, sitting, standing, and walking about six hours in an eight-hour workday, would have no manipulative limitations or limitations to pushing and pulling, occasional postural limitations, and no environmental limitations. (AR 65-66.) On November 29, 2012, agency consultative psychiatrist Dr. R. Murillo, M.D., reviewed the medical evidence and opined that Plaintiff's mental impairments were non-severe. (AR 62-63.)

On August 29, 2013, agency consultative physician Dr. Ernest Wong, M.D., reviewed the medical evidence on reconsideration and advised affirming the initial physical residual functional capacity assessment. (AR 108.) Dr. Wong opined Plaintiff would be limited to lifting or carrying 10 pounds frequently and 20 pounds occasionally, sitting, standing, and walking about six hours in an eight-hour workday, would have no manipulative limitations or limitations to pushing and pulling, occasional postural limitations, and no environmental limitations. (AR 112-13.) On August 30, 2013, agency consultative physician Dr. A. Garcia, M.D., reviewed the medical evidence on reconsideration and agreed with the initial determination that Plaintiff's mental impairments were non-severe. (AR 108-09.)

### 6. Health Services Agency Stanislaus

On May 1, 2013, Plaintiff was seen by physician's assistant Christie Ceballos, P.A., for chronic back pain and hypertension and complained of painful feet characterized by stinging, heat, and discomfort when in shoes. (AR 550; 592.) Plaintiff had decreased range of motion in her neck and head on examination and was referred to get a colon screening for hemorrhoids. (AR 550; 592.) On June 3, 2013, Plaintiff reported her boyfriend was in the hospital and she was "very stressed," her neck pain was radiating to her left arm, she was experiencing numbness and tingling in her extremities, and she was experiencing a sensation "like walking on hot glass." (AR 557; 588.) On examination, Plaintiff had decreased flexion and extension, increased tenderness in her back and left hip, and decreased range of motion in her neck. (AR 557; 588.)

On June 20, 2013, Plaintiff had an MRI of the cervical spine which revealed multilevel discogenic degenerative changes with mild reversal of normal cervical lordosis at C4-C5, C5-C6, and C6-C7; moderate bilateral foraminal stenosis at C6-C7; mild right foraminal stenosis and moderate to advanced left lateral recess foraminal stenosis secondary to uncovertebral spurring disc protrusion complex at C5-C6; mild to moderate bilateral foraminal stenosis, left greater than right, at C4-C5; and generally adequate preservation of vertebral body height.  (AR 562-63.)  An MRI of her lumbar spine also revealed moderate to advanced lumbar rotoscoliosis convex left; moderate to advanced bilateral facet arthropathy; and multilevel multifactorial discogenic degenerative change resulting in

- L5-S1: Moderate to advanced left foraminal stenosis.
- L4-5: Moderate left, mild right lateral recess, moderate to advanced bilateral foraminal stenosis secondary to left paracentral foraminal disc protrusion endplate ridging.
- L3-4: Central (5.5 mm), moderate to advanced right foraminal, mild bilateral lateral recess, left foraminal stenosis secondary to Grade 1 (5.5 mm) degenerative spondylolisthesis.
- L2-3: Moderate to advanced right foraminal stenosis.
- L1-2: Moderate right foraminal stenosis.
- T12-L1: Mild to moderate bilateral foraminal stenosis left greater than right.

(AR 565.)

On September 11, 2013, Plaintiff was seen for physical therapy for her "worsening symptoms" and noted to experience difficulty sitting for more than thirty minutes and walking more than twenty minutes.  (AR 580.)  Plaintiff self-reported pain of a 9/10 and on examination had decreased range of movement in her cervical spine.  (AR 580.)  Plaintiff's therapists, PA Ceballos and Dr. "Grim," M.D., opined Plaintiff had "good" potential to decrease her pain and improve her function.  (AR 580.)  Plaintiff attended physical therapy eleven times from September through October 2013, and repeatedly reported relief with a traction unit.  (AR 581-83; 584.)

**7.     Dr. Gold's Assessment Questionnaire**

On April 4, 2014, Dr. R.J. Gold, M.D., filled out a questionnaire wherein he opined Plaintiff's back pain and stiffness, bilateral lumbar spine radiculopathy, and left cervical spine

radiculopathy would preclude her from performing full-time work at any exertional level since June 2008. [3] (AR 606-07.)  Dr. Gold opined Plaintiff could sit three hours and stand and walk two hours in an eight-hour day and must otherwise lie down, must lie down or elevate her legs at least three hours in an eight-hour workday, and could lift less than ten pounds frequently.  (AR 606-07.)  He further opined that in an eight-hour workday Plaintiff could reach/grasp less than two hours, handle and push/pull less than one hour, and could never feel or perform fine finger manipulation due to distorted feeling in her hands.  (AR 607.)  He also opined that Plaintiff could reach/grasp and push/pull less than fifteen minutes and handle less than ten minutes at a time.  (AR 607.)

Dr. Gold based his opinion on "objective findings" of Plaintiff's "tenderness and limited mobility of c/spine and l/s spine.  Neuropathy of both legs, feet, and both arms (mostly left) neuropathy" and "clinical or laboratory abnormalities" of "diminished sensation alongside brachial nerve," "[a]ll muscle weakness," and "markedly diminished" deep tendon reflexes.  (AR 606.)  Dr. Gold diagnosed Plaintiff as having left cervical spine radiculopathy affecting her bilateral hands but her left more than her right.  (AR 606.)  Dr. Gold opined Plaintiff's "bilateral hip, knee pain, [and] stiffness" would limit her "ambulation, sitting, standing up, sitting down, [and] walking down and up stairs (*sic*)."  (AR 606.)

**B.     Testimony**

**1.     Plaintiff's Work History and Self-Assessment**

Plaintiff worked as a retail cashier from 1994 through 1998 and as a florist from 2000 through 2007.  (AR 257; 267.)  On August 7, 2012, Plaintiff completed a work history report describing her past work.  (AR 267-78.)  As a florist, Plaintiff lifted 50 pounds frequently and up to a 100 pounds at a time, walked and stood eight hours, stooped and handled big objects five hours, reached four hours, crouched and handled small objects three hours, climbed two hours, and knelt one hour in each eight-hour workday.  (AR 268.)  As a cashier, Plaintiff stood, handled big

---

[3]     The Court notes that despite the investment of considerable time and effort deciphering Dr. Gold's illegible and inconsistent handwriting, a few words remain subject to interpretation.  Notable examples are the word "motion" in "limited motion of c/spine and l/s spine" which Plaintiff has interpreted as the word "mobility" (Doc. 17, p. 9), and "All" in "All muscle weakness."  (AR 606.)  These words comprise the Court's best guess as to Dr. Gold's intended word choices.

objects, and reached for six hours, handled small objects for three hours, and stooped, crouched, and knelt for one hour in each eight-hour workday. (AR 269.) Plaintiff spent "approximately ½ of workday help[ing] customers push-pull, lift-move merchandise so that [she] could scan bar codes at [the] register" and lifted 25 pounds frequently and up to 50 pounds at a time. (AR 269.)

Plaintiff also completed an adult function report on August 5, 2012, describing her daily activities as consisting of watching television, sometimes eating breakfast, sometimes showering and dressing, getting her mail, letting her cats in and out of the house, feeding her two cats, watering outdoor plants when needed, straightening up her house if needed, helping to clean up the kitchen, making something to eat for dinner "if possible," and napping "if possible." (AR 279.) Plaintiff's roommate helps her take care of her cats. (AR 280.) Plaintiff's conditions affect her sleep "90% of the time" so that she "wake[s] up in pain every 2-3 hours each night, get[s] out of bed, sit[s] in the living room for 5-10 min[utes], go[es] to the restroom, and go[es] back to bed." (AR 280.) She spends much of her time in "pajamas" and showers every 2-3 days instead of every day and cannot bathe, she keeps her hair short to make it easier to care for, shaves occasionally, feeds herself, and is able to use the toilet unaided. (AR 280.) She requires reminders to color her hair and remove facial hair. (AR 281.)

Plaintiff prepares her own meals of "soup, sandwiches, [and] quick dinners" taking 10-15 minutes "most days." (AR 281.) Plaintiff does light house work, laundry, and waters outdoors, but requires help "with a lot of it" and takes "too many 'breaks.'" (AR 281.) In response to the question "Do you need help or encouragement doing these things?" on the adult function report form, however, Plaintiff crossed out the box marked "yes" and checked the box marked "no." (AR 281.)

Plaintiff then noted that she does not do household chores or yardwork because "it is very painful to move the way required" and "when I do clean it takes a very long time and it takes many days to recover." (AR 282.) Plaintiff goes outside to get the mail every day, walks or drives a car when out, and goes grocery shopping "a few times a month" for thirty to fifty minutes. (AR 282.) Plaintiff crochets "but only off and on because it is painful to sit too long and keep my head in certain positions." (AR 283.) She "can cook and bake only it takes long (sic) because I

1 must stop a lot." (AR 283.) Plaintiff's "pain in [her] back, neck, hips and feet most of the time

2 prevents [her] from even trying" to do any of her past hobbies "and when [she] do[es] [she] hurt[s]

3 severely for several days" as a result. (AR 283.) Plaintiff spends time with her roommate every

4 day, talks on the phone three times a month and visits with friends once every three months. (AR

5 283.) She "most often ha[s] no desire to talk or visit with anyone and when [she] do[es] it is

6 obvious that folks are upset with [her] for not staying in consist[e]nt contact." (AR 284.)

7       Plaintiff has limitations in her ability to lift, walk, squat, sit, bend, kneel, stand, reach,

8 climb stairs, get along with others, concentrate, and complete tasks and has problems with her

9 memory. (AR 284.) "It hurts to lift a gallon of milk for any length of time. [It is] [p]ainful to

10 bend, reach, stand, sit too long. <u>No</u> kneeling [or] squatting. Little bending & stair climbing."

11 (AR 284.) Plaintiff can walk ten to fifteen minutes before needing to rest for ten to fifteen

12 minutes, can pay attention for fifteen to twenty minutes, follows instructions without issue, and is

13 unable to complete tasks because she must "get up, move around, readjust." (AR 284.) She does

14 not handle stress "real well," and "tend[s] to ignore things and hope it will 'go away' [and] work

15 out somehow" but does tolerate changes in routine "okay." (AR 285.)

16       **2.**     **Third Party Assessments and Reports**

17       On August 8, 2012, Plaintiff's roommate R.L. Greenwood completed a third-party adult

18 function report (AR 287-95), largely repeating the contents of Plaintiff's adult function report.

19 (*Compare* AR 267-78 *with* 287-95.) Mr. Greenwood reported that on an average day, Plaintiff

20 will do "light housekeeping" like "dusting," watch television, and water the yard and plants "most

21 nights." (AR 287; 289; 290.) Plaintiff takes a long time to do chores and only does them "when

22 she absolutely has to." (AR 289.) She requires "encouragement!" and help with "any kind of

23 lifting." (AR 289.) She goes to the park across the street from her house regularly with her

24 grandchildren. (AR 292.) He also noted Plaintiff has a "fear of falling and making matters worse

25 than they already are." (AR 294.)

26 //

27 //

28 //

### 3.     Hearing Testimony

#### a.     Plaintiff's Testimony at Hearing

Plaintiff testified that she has pain in her back and neck running into her arms and legs. (AR 38.)  She has not had surgery or had surgery recommended to treat her symptoms, and has been diagnosed with degenerative disc disease and arthritis.  (AR 38; *see also* 42-43 (doctor told her she was not a candidate for surgery).)   She has hypertension but it is controlled with medication.  (AR 38-39.)  She used to take medications for depression and anxiety but could not afford to continue, and answered both that she does not currently have any mental health problems bothering her and that she occasionally has difficulties with depression and anxiety.  (AR 39.)

Plaintiff lives with a male roommate who helps her with mopping and sweeping the floors. (AR 39-40.)  Plaintiff has difficulty with bending and reaching to sweep or vacuum.  (AR 40.) Plaintiff does not drive often because in 2010, when she returned to the state, she did not get her California driver's license.  (AR 40.)  She testified that she would not be able to work a fulltime job because she "would just be in such pain" and "would be in a corner crying."  (AR 41.)

Plaintiff testified that she stopped working her last job due to pain and was previously a "fairly consistent" worker.  (AR 41.)  The pain causes her to have problems being on her feet, and she spends most of her time off her feet or lying down.  (AR 41-42.)  Her bilateral foot pain related to her back pain feels "like [she's] walking on hot glass and it – it affects the tops occasionally, but the bottoms are worse."  (AR 43.)  Plaintiff can spend thirty minutes at most on her feet.  (AR 45.)  She spends three hours in each eight-hour day sitting on a recliner with her feet elevated or lying down.  (AR 42.)  Plaintiff has tried injections, pain medications, and ice and a heating pad to treat her symptoms.  (AR 43.)  She currently applies a heating pad daily.  (AR 43.) Her neck arthritis causes her to have difficulty moving her neck freely, and presented difficulties for her in her last job.  (AR 44.)  Plaintiff has difficulties using her hands for long periods of time due to her cervical radiculopathy.  (AR 50.)  She has difficulty opening jars but is able to wash dishes for ten minutes and write things like her signature, though she does not write letters or type. (AR 50-51.)  After using her hands to wash dishes she has to rest her hands for half an hour before using them again.  (AR 51.)

Plaintiff testified that her examination with the agency examining physician was "significantly" shorter than her normal evaluations with her treating physician, lasting only 10 minutes and consisting of mostly talking rather than any physical examination. (AR 45.) Plaintiff requested to stand during the hearing and noted that she has to alternate positions every twenty to thirty minutes maximum, preferably every fifteen minutes. (AR 44-46.)

### b.    Vocation Expert Testimony at Hearing

The ALJ introduced the Vocational Expert ("VE"), noting the VE had previously prepared a "Form 12E" listing "every past type of job that [Plaintiff] indicated with her applications." (AR 47; *see* AR 313.) The VE testified that the information was the same information he would have provided in response to the ALJ's inquiry about Plaintiff's past relevant work. (AR 47.) Form 12E listed Plaintiff's past relevant work as a florist, Dictionary of Occupational Titles ("DOT") 142.081-010, light work as defined in the DOT but performed as heavy, and as a cashier II, DOT 211.461-010, light work as defined in the DOT but performed as medium. (AR 313.)

The ALJ asked the VE to consider a hypothetical individual of the same age, educational background, and work history as described in Form 12E, with the following functional limitations:

> This person could sit six hours, but stand and/or walk less than even two hours each; lift and/or carry less than 10 pounds even occasionally; never climb, balance, stoop, kneel, crouch, or crawl; would need numerous unscheduled rest breaks more frequently than an employer would normally allow; and would not have . . . sufficient concentration ability for even simple, routine, repetitive tasks.

(AR 48.) The VE testified that such an individual could not work.

The ALJ then asked the VE to consider a hypothetical individual of the same age, educational background, and work history as described in Form 12E, with the following functional limitations:

> . . . could only do jobs involving simple, routine, repetitive tasks; could sit, stand, walk six out of eight hours each with normal breaks; lift and/or carry 20 pounds occasionally/10 pounds frequently; could occasionally climb, balance, stoop, kneel, crouch, or crawl.

(AR 48.) The VE testified that such an individual could perform Plaintiff's past relevant work as a cashier II, as defined by the DOT, as well as other work in the national economy, including representative occupations of photocopying machine operator, DOT 207.685-014, office mail

14

clerk, DOT 209.687-026, and information clerk, DOT 237.367-018, all unskilled, light work.  (AR 49.)  The VE testified that his testimony was consistent with the DOT.  (AR 49-50.)

Plaintiff's attorney asked the VE to consider the same individual as in the second hypothetical, with the additional restriction that the individual could not use their hands for reaching, grasping, handling, or manipulation more than fifteen minutes at a time and no more than one to two hours per eight-hour day.  (AR 51.)  The VE testified that such an individual would not be able to perform the requirements of any of the jobs cited.  (AR 51.)

**C.      Administrative Proceedings**

On July 23, 2014, the ALJ issued a written decision and determined Plaintiff was not disabled.   (AR 17-29.)   The ALJ found that Plaintiff had severe impairments including degenerative disc disease and depression.  (AR 19.)  The ALJ determined that these impairments did not meet or equal a listed impairment.  (AR 20-21.)  The ALJ found Plaintiff retained the residual functional capacity ("RFC")

> . . . to perform light work as defined in 20 CFR 404.1567(b) except [she] can lift and/or carry 20 pounds occasionally and 10 pounds frequently; she can sit, stand, and/or walk for six hours out of an eight-hour workday with regular breaks; she can occasionally kneel, balance, and stoop; and she is limited to simple routine repetitive tasks.

(AR 21.)

Given this RFC, the ALJ found that Plaintiff was capable of performing her past relevant work as a Cashier II, DOT 211.462-010.  (AR 27.)  After considering Plaintiff's age, education, work experience, and RFC, the ALJ determined there were other jobs existing in significant numbers in the national economy she could also perform, including representative occupations machine operator, DOT 207.685-014, mail clerk, DOT 209.687-026, and reception information clerk, DOT 237.367-018, all light, unskilled work.  (AR 28.)  The ALJ concluded that Plaintiff was not disabled, as defined in sections 202(e) and 223(d) of the Social Security Act.  (AR 29.)

The Appeals Council denied Plaintiff's request for review on November 17, 2014, making the ALJ's decision the Commissioner's final determination for purposes of judicial review. (AR 1-4.)

//

1   **D.      Plaintiff's Complaint**

2           On January 16, 2015, Plaintiff filed a complaint before this Court seeking review of the

3   ALJ's decision.  (Doc. 1.)  Plaintiff argues that the ALJ failed to articulate legally sufficient

4   reasons for discounting the opinion of her treating physician or clear and convincing reasons for

5   finding Plaintiff's statements less than fully credible.  (Doc. 17.)

6                                   **III.    SCOPE OF REVIEW**

7           The ALJ's decision denying benefits "will be disturbed only if that decision is not

8   supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599,

9   601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its

10  judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).

11  Instead, the Court must determine whether the Commissioner applied the proper legal standards

12  and whether substantial evidence exists in the record to support the Commissioner's findings.  *See*

13  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

14          "Substantial evidence is more than a mere scintilla but less than a preponderance."  *Ryan v.*

15  *Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such

16  relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

17  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*,

18  305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both

19  the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and

20  may not affirm simply by isolating a specific quantum of supporting evidence."  *Lingenfelter v.*

21  *Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

22                                  **IV.    APPLICABLE LAW**[4]

23          An individual is considered disabled for purposes of disability benefits if he is unable to

24  engage in any substantial, gainful activity by reason of any medically determinable physical or

25

26  ---
    [4]     To be eligible for DWB, plaintiff must show that she became disabled within seven years of her spouse's death.
    20 C.F.R. § 404.335(c)(1).  Here, Plaintiff had not engaged in substantial gainful activity since July 20, 2007, the
27  alleged onset date.  (AR 19.)  Plaintiff premised her application on disability benefits under Title II. (AR 19.)  Under
    section 202, the prescribed period began on December 26, 2003, and ended on December 31, 2010, seven years later.
28  (AR 19; 265.)

mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3) (A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.  In Step 1, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b), 416.920(b).  If not, the ALJ must determine at Step 2 whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities.  *Id.* §§ 404.1520(c), 416.920(c).  If so, the ALJ moves to Step 3 and determines whether the claimant has a severe impairment or combination of impairments that meet or equal the requirements of the Listing of Impairments ("Listing"), 20 § 404, Subpart P, App. 1, and is therefore presumptively disabled.  *Id.* §§ 404.1520(d), 416.920(d).  If not, at Step 4 the ALJ must determine whether the claimant has sufficient RFC despite the impairment or various limitations to perform her past work.  *Id.* §§ 404.1520(f), 416.920(f).  If not, at Step 5, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.  *Id.* §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V.   DISCUSSION

Plaintiff contends the ALJ erred by rejecting the opinion of her treating physician and by finding Plaintiff's statements less than fully credible.  (Doc. 17.)

//

//

1    **A.      The ALJ's Consideration of Plaintiff's Testimony**

2          Plaintiff contends the ALJ failed to articulate clear and convincing reasons for discounting

3    her statements regarding the severity and extent of her ongoing symptoms.  (Doc. 17, pp. 12-18.)

4    Plaintiff asserts the ALJ improperly rejected Plaintiff's testimony as inconsistent with Plaintiff's

5    "somewhat normal level of daily activity," infrequent treatment, history of conservative treatment

6    and refusal of a referral, lack of muscle atrophy, and sporadic work history.  (Doc. 17, p. 12 (citing

7    AR 22-23).)   According to Plaintiff, "[i]n making these findings, the ALJ extrapolate[d] well

8    beyond inferences reasonably supported by the record."  (Doc. 17, p. 12.)

9          The Commissioner responds that the ALJ properly found Plaintiff's statements about the

10   alleged intensity, persistence, and limiting effects of her impairments to be less than fully credible

11   based on Plaintiff's own function report and hearing testimony, history of conservative medical

12   treatment, the "utter absence of atrophy" in the medical record, and work history.   (Doc. 20,

13   pp. 4-7.)

14         **1.      Legal Standard**

15         In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ

16   must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009); *Bunnell*

17   *v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc).  First, the ALJ must determine whether

18   the claimant has presented objective medical evidence of an underlying impairment that could

19   reasonably be expected to produce the pain or other symptoms alleged.  *Vasquez*, 572 F.3d at 591.

20   The claimant is not required to show that his impairment "could reasonably be expected to cause

21   the severity of the symptom [he] has alleged; she need only show that it could reasonably have

22   caused some degree of the symptom."   *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).   If the

23   claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the

24   claimant's testimony about the severity of the symptoms if she gives "specific, clear and

25   convincing reasons" for the rejection.  *Id.*

26         The ALJ also may consider (1) the claimant's reputation for truthfulness, prior inconsistent

27   statements, or other inconsistent testimony, (2) unexplained or inadequately explained failure to

28   seek treatment or to follow a prescribed course of treatment, and (3) the claimant's daily activities.

1   *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *see also Bray v. Comm'r of Soc. Sec.*

2   *Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir.

3   1996); 20 C.F.R. §§ 404.1529, 416.929.   "If the ALJ's finding is supported by substantial

4   evidence, the court may not engage in second-guessing." *Tommasetti*, 533 F.3d at 1039.

5
6   **2.    The ALJ Properly Discounted Plaintiff's Testimony Regarding the Alleged Intensity, Persistence, and Limiting Effects of Her Mental Impairments**

7   The ALJ expressly found that Plaintiff's medically determinable impairments could

8   reasonably be expected to cause her alleged symptoms.  (AR 22.) This finding satisfies the first

9   step of the required credibility analysis.  Further, the ALJ made no "finding of malingering based

10   on affirmative evidence thereof." *Robbins v. Soc. Sec. Admin*, 466 F.3d 880, 883 (9th Cir. 2006).

11   Consequently, at the second step of the credibility analysis, the ALJ was required to make

12   specific, clear, and convincing findings to support an adverse credibility determination.

13   Plaintiff first argues the ALJ improperly discounted her credibility as inconsistent with her

14   history of medical treatment.  (Doc. 17, pp. 15-17.)  The ALJ noted that Plaintiff

15   . . . has not generally received the type of medical treatment one would expect for a totally disabled individual, as evidenced by relatively infrequent trips to a doctor

16   for the allegedly disabling symptoms and significant gaps in [Plaintiff]'s treatment history.  Moreover, [Plaintiff] presented to her treating doctor on

17   several occasions without any particular complaints or just to get refills of her medications.

18
19   . . . even when [Plaintiff] has received treatment for the allegedly disabling impairments, that treatment has been essentially routine and conservative in

20   nature[ ], primarily in the form of pain medication.  In fact, [Plaintiff] declined more aggressive treatment.  The lack of more aggressive treatment, such as

21   surgical intervention or even a referral to a specialist suggests [Plaintiff]'s symptoms and limitations were not as severe as she alleged.  The credibility of

22   [Plaintiff]'s allegations regarding the severity of her symptoms and limitations is diminished because those allegations are greater than expected in light of the

23   objective evidence of record.

24   (AR 23 (internal citations omitted).)

25   While Plaintiff is correct that she has, for the most part, seen her physicians on a monthly

26   basis over the past several years, Plaintiff has really only pursued conservative treatment,

27   appearing at regular appointments solely to refill her pain medication prescription.  (*See* AR 316-

28   605.)  Moreover, Plaintiff has repeatedly declined or quickly abandoned any treatment beyond

19

narcotic pain medication (*see* AR 253 (declining Dr. Aggarwal's recommendation of physical therapy and stating she "want[ed] to continue with conservative treatment"); 341 (noting Plaintiff's treatment plan was to be managed by pain medications "only"); 347-54 (Plaintiff had one cervical transforaminal epidural steroid injection with some improvement before discontinuing injections without explanation); 355 (declining Dr. Aggarwal's repeated recommendation of physical therapy); 580-83 (attending eleven biweekly physical therapy sessions with some relief with use of a traction unit before abandoning therapy without explanation), and currently treats her pain with pain medication and the daily application of heating pads (AR 43).

Plaintiff's argument that her reliance on pain medication and refusal of more aggressive treatment are not somehow "conservative treatment" is unconvincing.  This is not a case where Plaintiff had a history of surgical intervention, repeated nerve blocks or trigger point injections, and "copious amounts of narcotic pain medications" together bolstering her allegations of disabling pain.  *Cf. Lapeirre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010) (reversing ALJ's adverse credibility finding as unsupported by substantial evidence based on plaintiff's history of cervical fusion surgery in an attempt to relieve her pain symptoms followed by narcotic pain medications, occipital nerve blocks, and trigger point injections); *Christie v. Astrue*, No. CV 10-3448-PJW, 2011 WL 4368189, at *4 (C.D. Cal. Sept. 16, 2011) (reversing ALJ's adverse credibility finding as unsupported when plaintiff demonstrated a history of "many different treatment modalities, including narcotic pain medication, steroid injections, trigger point injections, epidural shots, and cervical traction," which while not necessarily "the most aggressive available" treatments, in combination convinced the court that "they are certainly not what the Court would categorize as conservative"); *Huerta v. Astrue*, No. EDCV 07-1617-RC, 2009 WL 2241797, at *4 (C.D. Cal. Jul. 22, 2009) (reversing ALJ's adverse credibility finding as unsupported by substantial evidence based on plaintiff's history of neck surgery, in combination with referral to an anesthesiologist for pain management and receipt of a series of epidural steroid injections into her cervical spine).  In fact, Plaintiff repeatedly reported that her pain symptoms are adequately controlled by her pain medication (*see* AR 24-25; 402; 448-61), and impairments that

are effectively controlled with medication are not disabling under the Social Security Act, *see Warre v. Comm'r of Soc. Sec.*, 439 F.3d 1001, 1006 (9th Cir. 2006). *See also Bunnell*, 947 F.2d at 346 (noting that the "[t]ype, dosage, effectiveness, and adverse side-effects of any pain medication" is one factor that the adjudicator must consider in determining the claimant's credibility (quoting SSR 88–13)); *Hughes v. Astrue*, No. 09-CV-2815-IEG-WMC, 2010 WL 3341660, at *6 (S.D. Cal. Aug. 24, 2010) (affirming ALJ's adverse credibility finding that plaintiff's pain was effectively kept "at a manageable level" by pain medication, despite that plaintiff had a history of three surgeries and steroid injections in his back).

The ALJ permissibly discounted Plaintiff's credibility based on her history of generally conservative treatment, which as discussed above, comprised of appearing at regular appointments solely to refill her pain medication prescription. (*See* AR 316-605.) *See* SSR 96-7p, 1996 WL 374186, at *7 (an "individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints"); *Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007) (stating that "evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment") (citing *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995)); *Tommasetti*, 533 F.3d at 1040 (describing physical therapy as conservative treatment and noting that an ALJ may infer that a claimant's "response to conservative treatment undermines [his] reports regarding the disabling nature of his pain"); *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (as amended) (rejecting subjective pain complaints where petitioner's "claim that she experienced pain approaching the highest level imaginable was inconsistent with the 'minimal, conservative treatment' that she received").

Plaintiff also contends the ALJ improperly rejected her pain and symptom testimony due to the lack of evidence in the record of "muscle atrophy [which] is a common side effect of prolonged and/or chronic pain due to lack of use of a muscle in order to avoid pain." (AR 23; *see* Doc. 17, p. 17.) The ALJ concluded that "although [Plaintiff] experienced some degree of pain in her neck and back, the pain has not altered her use of those muscles to an extent that has resulted in atrophy." (AR 23.) An ALJ may consider a claimant's lack of muscle atrophy in cases where the claimant testifies that she is inactive to the extent that muscle atrophy would necessarily occur.

1  *See, e.g., Osenbrock v. Apfel*, 240 F.3d 1157, 1166 (9th Cir. 2001) (affirming ALJ's credibility

2  finding on the basis of a lack of evidence of "disuse muscle atrophy"); *Meanel*, 172 F.3d at 1114

3  (affirming the ALJ's discrediting of the Plaintiff's testimony that her pain required her to lie in a

4  fetal position all day based, in part, on the fact that the claimant "did not exhibit muscular atrophy

5  or any other physical signs of an inactive, totally incapacitated individual"); *Cotton v. Astrue*, 374

6  F. App'x 769, 770 (9th Cir. 2010) (ALJ properly discredited testimony that chronic fatigue, pain

7  and fibromyalgia that caused claimant to stay in bed for days, in part, because there was "no

8  objective evidence of a back disorder, loss of motor strength, diminished reflexes, dermatomal

9  loss of sensation, spasm, or loss of joint motion"); *Stiles v. Astrue*, 256 F. App'x 994, 997 (9th Cir.

10 2007) (ALJ properly discredited excess pain testimony because there was "no evidence of disuse

11 muscle atrophy or wasting commonly associated with severe pain"); *Lasich v. Astrue*, 252 F.

12 App'x 823, 825 (9th Cir. 2007) (ALJ properly discredited excess pain testimony due to "a lack of

13 muscle atrophy and weakness" to support claims of "inactivity, chronic fatigue and bedrest");

14 *Pruitt v. Astrue*, No. CV 11-8158-E, 2012 WL 2006150, at *3 (C.D. Cal. June 5, 2012) (a "lack of

15 severe disuse muscle atrophy can be a 'clear and convincing' reason for rejecting the credibility of

16 a claimant who testifies to debilitating pain").  *But see Winans v. Colvin*, No. CV-13-00613-TUC-

17 BPV, 2014 WL 4259471 (D. Ariz. Aug. 29, 2014) (holding the ALJ's reliance on his own

18 observations of claimant and his own lay opinions of the medical significance of the absence of

19 muscle wasting and weight loss due to chronic pervasive pain to be error).

20        Here, Plaintiff testified that in addition to time spent sleeping, she spends at least three

21 hours sitting in a recliner with her feet elevated or lying down during a normal day (AR 42), and

22 generally spends most of her time off her feet or lying down (AR 41-42) or napping "if possible"

23 (AR 279).  However, on examination, she was repeatedly noted to have 5/5 and 4/5 strength in her

24 bilateral upper and lower extremities (*see* AR 356; 352-54; 426) and observed to have normal bulk

25 and muscle tone (*see* AR 426).  Plaintiff argues that the ALJ was improperly practicing medicine

26 by concluding that clinical findings of muscle atrophy "is a diagnostic sign of severe impairment

27 in Plaintiff's situation."  (Doc. 17, p. 17.)  However, the ALJ did not reach such a conclusion.

28 Rather, consistent with the above-cited-authorities, the ALJ properly concluded that if a person

1  claims pain so severe that she spends the majority of her life lying down or resting in a recliner, as

2  Plaintiff testified in this case, then that person should exhibit some loss of muscle strength and

3  atrophy. "[T]he inconsistency between Plaintiff's testimony and the clinical findings that she does

4  not exhibit muscle atrophy or other physical manifestations of chronic pain was a valid reason for

5  the ALJ to discredit her testimony." *Ruffin v. Colvin*, No. CV 14-2611 KES, 2015 WL 5842340,

6  at *6 (C.D. Cal. Oct. 6, 2015).

7       Plaintiff also contends the ALJ improperly rejected her subjective testimony because he

8  believed it to be "inconsistent" with those activities "typically engaged in by 'totally disabled'

9  individuals." (Doc. 17, pp. 15 (citing AR 22).) Plaintiff argues her "activities hardly constitute

10 activities that are transferable to a work setting as the ALJ claim[ed]." (Doc. 17, p. 15 (citing

11 *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005)).) The Commissioner responds that the ALJ

12 properly relied on Plaintiff's own function report and hearing testimony to determine that "[s]ome

13 of the physical and mental abilities and social interactions required in order to perform these

14 activities are the same as those necessary for obtaining and maintaining employment." (Doc. 20,

15 p. 5.)

16      While the mere fact that a claimant engages in certain daily activities does not necessarily

17 detract from her credibility as to overall disability, daily activities support an adverse credibility

18 finding if a claimant is able to spend a substantial part of her day engaged in pursuits involving the

19 performance of physical functions or skills that are transferable to a work setting. *Orn v. Astrue*,

20 495 F.3d 635, 639 (9th Cir. 2007); *see also Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir.

21 2001). A claimant's performance of chores such as preparing meals, cleaning house, doing

22 laundry, shopping, occasional childcare, and interacting with others has been considered sufficient

23 evidence to support an adverse credibility finding when performed for a substantial portion of the

24 day. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008); *Burch*, 400 F.3d at

25 680-81; *Thomas*, 278 F.3d at 959.

26      Here, the ALJ reviewed Plaintiff's testimony at the hearing and in her adult function

27 report, and concluded that

28 //

. . . Despite her impairments, [Plaintiff] has engaged in a somewhat normal level of daily activity and interaction. Although [Plaintiff] claimed that she spent her days lying down, she admitted she [is] able to care for her own personal hygiene, drive, use public transportation, prepare simple meals, grocery shop, complete light household chores, visit with family and friends, and could relate to strangers. Some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment. [Plaintiff]'s ability to participate in such activities diminishes the credibility of [Plaintiff]'s allegations of functional limitations.

(AR 22-23.)

Contrary to Plaintiff's contention, the activities described in these adult function reports are not sporadic and limited activities incapable of being transferred to a work setting. (*See* Doc. 17, p. 15.) This is not a case where the Plaintiff testified that she was completely dependent for her activities of daily living. Plaintiff sustained a social relationship with her roommate and had a boyfriend, prepared her own meals, cared for her personal hygiene, used public transportation and drove independently, performed light household chores, shopped for groceries, took care of her cats, and visited with others. (AR 22-23; 280-85.) These types of activities tend to suggest Plaintiff is still capable of performing the basic demands of light, unskilled work on a sustained basis. *See, e.g., Stubbs-Danielson*, 539 F.3d at 1175 (the ALJ sufficiently explained his reasons for discrediting the claimant's testimony because the record reflected that the claimant performed normal activities of daily living, including cooking, housecleaning, doing laundry, and helping her husband in managing finances – all of which "tend[ed] to suggest that the claimant may still be capable of performing the basic demands of competitive, remunerative, unskilled work on a sustained basis"); *Burch*, 400 F.3d at 680 (the ALJ sufficiently explained his reasons for discrediting the claimant's testimony because the record "suggest[ed] that she is quite functional. She is able to care for her own personal needs, cook, clean and shop. She interacts with her nephew and her boyfriend"). *See also Valentine v. Astrue*, 574 F.3d 685, 694 (9th Cir. 2009) (ALJ properly recognized that daily activities "did not suggest [the claimant] could return to his old job" but "did suggest that [the claimant's] later claims about the severity of his limitations were exaggerated"). While Plaintiff has challenges in performing the postural and physical requirements of the full spectrum of work, her ability to handle her own daily needs, drive and

1   take public transportation, tolerate changes in routine, relate to strangers, and socialize are

2   inconsistent with her claimed total inability to work.  (AR 280-84.)

3       Finally, the ALJ noted that Plaintiff "worked only sporadically prior to the alleged

4   disability onset date," and concluded that this sporadic work history "raises a question as to

5   whether [Plaintiff]'s continuing unemployment is actually due to medical impairments."  (AR 23.)

6   As discussed the court in *Schultz v. Colvin*

7   
8       The import of these statements is non-obvious.  At best, the ALJ is attending to an
        irrelevant portion of the record, for it does not follow from the fact that Plaintiff
9       stopped working when she had an inheritance and savings to rely upon that she is
        able to work now that those resources, many years later, have been extinguished.
10      At worst, the ALJ insinuates malingering without making the affirmative findings
        required to support such a conclusion.  *See Lester v. Chater*, 81 F.3d 821, 834 (9th
11      Cir. 1995).  However, this is a case where "[n]o witness, qualified expert or
        otherwise, expressed the opinion that claimant was in any way malingering."
12      *Gallant v. Heckler*, 753 F.2d 1450, 1455 (9th Cir. 1984).  In such a case, an ALJ's
        failure to support with "specific, cogent reasons" an adverse credibility
13      determination with respect to a claimant's testimony concerning medically
        supported symptoms is legal error.  *E.g., Greger v. Barnhart*, 464 F.3d 968, 975
14      (9th Cir. 2006).

15  32 F. Supp. 3d 1047, 1061 (N.D. Cal. 2014).  Though Plaintiff is correct that the ALJ erred by

16  insinuating malingering with his statement regarding her sporadic work history, any error in the

17  ALJ's credibility analysis on the basis of her work history is harmless because the ALJ's

18  credibility finding rested on several other grounds that, as discussed above, when taken together,

19  provide clear and clear and convincing reasons supported by substantial evidence in the record.

20  *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Ci. 2004) (applying harmless

21  error standard where one of the ALJ's several reasons supporting an adverse credibility finding

22  was held invalid); *Carmickle v. Comm'r of Soc. Sec. Admin.*, 553 F.3d 1155, 1162 (9th Cir. 2008)

23  (an error is harmless where there "remains substantial evidence supporting the ALJ's conclusions

24  on . . . credibility and the error does not negate the validity of the ALJ's ultimate [credibility]

25  conclusion") (internal citation and quotations omitted) (alteration in original).

26      In sum, the ALJ's reasons were properly supported by the record and sufficiently specific

27  to allow the Court to conclude that he rejected Plaintiff's testimony on permissible grounds, and

28  did not arbitrarily discredit Plaintiff's testimony.

**B.     The ALJ's Consideration of the Medical Evidence**

Plaintiff contends the ALJ failed to articulate specific and legitimate reasons for rejecting Dr. Gold's assessment of Plaintiff's ability to work.  (Doc. 17, pp. 7-12.)  Defendant asserts the ALJ properly weighed Dr. Gold's opinion and provided legally sufficient reasons for discrediting his opinion.  (Doc. 20, pp. 7-8.)

### 1.     Legal Standard

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion. *Id.* Where a treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record. *Id.* at 830-31; *accord Valentine*, 574 F.3d at 692. The ALJ can meet this burden by setting forth a detailed and thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof, and making findings. *Tommasetti*, 533 F.3d at 1041. Factors relevant to evaluating medical opinions include the amount of relevant evidence that supports the opinion and the quality of the explanation provided and the consistency of the medical opinion with the record as a whole. *See Orn*, 495 F.3d at 631 (citing 20 C.F.R. § 404.1527(d)(3)-(6)).

### 2.     The ALJ Properly Rejected Dr. Gold's Medical Opinion as Brief, Conclusory, and Inadequately Supported by Clinical Findings

In his two-page assessment, Dr. Gold opined Plaintiff's back pain and stiffness, bilateral lumbar spine radiculopathy, and left cervical spine radiculopathy would preclude her from performing full-time work at any exertional level.  (AR 606-07.)  Dr. Gold specifically opined that in an eight-hour day Plaintiff could sit three hours, stand and walk two hours, and must otherwise lie down; must lie down or elevate her legs at least three hours; could reach/grasp less than two hours, handle and push/pull less than one hour, and could never feel or perform fine finger

1    manipulation; and could lift less than ten pounds frequently.  (AR 606-07.)  He also opined that

2    Plaintiff could reach/grasp and push/pull less than fifteen minutes at a time and handle less than

3    ten minutes at a time.  (AR 607.)

4    //

5            Dr. Gold based his opinion on "objective findings" of Plaintiff's "tenderness and limited

6    motion of c/spine and l/s spine.  Neuropathy of both legs, feet, and both arms (mostly left)

7    neuropathy" and "clinical or laboratory abnormalities" of "diminished sensation alongside brachial

8    nerve," "[a]ll muscle weakness," and "markedly diminished" deep tendon reflexes.  (AR 606.)  Dr.

9    Gold diagnosed Plaintiff as having left cervical spine radiculopathy affecting her bilateral hands

10   but her left more than her right.  (AR 606.)  Dr. Gold opined Plaintiff's "bilateral hip, knee pain,

11   [and] stiffness" would limit her "ambulation, sitting, standing up, sitting down, [and] walking

12   down and up stairs (*sic*)."  (AR 606.)  There are no other findings, clinical observations, or treating

13   notes signed by or attributed to Dr. Gold in the record.

14           The ALJ considered Dr. Gold's opinion that Plaintiff was unable to work, but gave it little

15   weight because it was "brief, conclusory, and inadequately supported by clinical findings" and

16   inconsistent with Plaintiff's admitted activities of daily living.  (AR 26.)  The ALJ noted that

17           Dr. Gold primarily summarized the treatment notes, [Plaintiff]'s subjective
18           complaints, diagnoses, and treatment, but he did not provide medically acceptable
             clinical or diagnostic findings to support the overly [restrictive] functional
19           assessment.  Instead, it appears that he based his opinion largely on [Plaintiff]'s
             subjective complaints, which are not consistent with the objective medical
20           evidence. . . . the physical findings, conservative treatment, and decline for more
             aggressive treatment, indicates (*sic*) that her symptoms are not as severe as
21           alleged.  This opinion is also inconsistent with [Plaintiff]'s admitted activities of
22           daily living[.]

23   (AR 26.)

24           Plaintiff contends the ALJ erred in rejecting Dr. Gold's opinion as unsupported by clinical

25   or diagnostic findings.  (Doc. 17, p. 9 (citing AR 26).)  Defendant responds that while "Dr. Gold

26   summarized treatment notes, subjective complaints, and diagnoses, [ ] the doctor did not provide

27   medically acceptable clinical or diagnostic findings to support the overly restrictive functional

28   assessment."  (Doc. 20, p. 7.)  Plaintiff notes Dr. Gold reported observing "diminished sensation in

Plaintiff's brachial nerve and markedly decreased reflex response" and cited "tenderness and limited mobility in the cervical spine and neuropathy in both legs, feet[,] and arms." (Doc. 17, p. 9 (citing AR 606).)   Defendant disagrees that these are "medically acceptable clinical or diagnostic findings" that can be relied upon to support Dr. Gold's "overly restrictive functional assessment." (Doc. 20, p. 7.)  Plaintiff further contends Dr. Gold's opinion was bolstered by the objective imaging, including the results of imaging of Plaintiff's cervical spine from 2009 through 2013 "showing moderate to advanced degenerative disc disease at the C4-C5, C5-C6[,] and C6-C7 levels" and "moderate left nerve compression at C5-C6 and bilateral nerve compression at C4-C5." (Doc. 17, p. 9 (citing AR 563; 488; 490).)

Under the regulations, clinical findings include the results of physical or mental status examinations, and diagnostic findings are statements of the disease or injury based on its "signs and symptoms." *See* 20 C.F.R. §§ 404.1513(b), 416.913(b).   While a medical report should include clinical findings and diagnoses, there is no requirement that clinical and diagnostic "evidence" must be submitted with a residual functional capacity assessment, *see id.*, particularly if the record already contains such evidence. *Giles v. Astrue*, No. EDCV 08-1088-JC,2009 WL 2984049, at *7 (C.D. Cal. Sept. 17, 2009.)

Here, Dr. Gold's opinion refers to clinical findings and diagnoses, albeit in an abbreviated fashion (*i.e.*, bilateral lumbar spine radiculopathy; left cervical spine radiculopathy; bilateral neuropathy of legs, feet, and arms; "markedly diminished" deep tendon reflexes; muscle weakness; "diminished sensation along brachial nerve") (AR 606-07); however, it is unclear by what metrics he reached these diagnoses or observed these symptoms and there are no other treating records from Dr. Gold contained within the administrative record to determine if he reached them during prior examinations.   The ALJ correctly pointed out that Dr. Gold was summarizing diagnoses and findings reached at some point or communicated to him by Plaintiff; however, there is nothing in this two-page assessment indicating that Dr. Gold independently reached these diagnoses or made these findings.   (*See* AR 606-07.)   There are *no other treating records* for the Court to refer to in order to determine whether Dr. Gold was summarizing notes in Plaintiff's medical records, memorializing Plaintiff's self-reported diagnoses and symptoms, or

1  independently reaching these conclusions based on their treating relationship and his examinations

2  of Plaintiff.  Accordingly, the ALJ properly rejected Dr. Gold's opinion as unsupported by clinical

3  findings or diagnostic findings.

4          Plaintiff asserts the ALJ erroneously determined that "the physical findings, conservative

5  treatment[,] and Plaintiff's wish to not pursue more aggressive treatment undermined [Dr. Gold's]

6  opinion."  (Doc. 17, p. 10 (citing AR 26).)  Plaintiff contends the ALJ failed to point to which

7  specific findings he believed undermined Dr. Gold's opinion, arguing that "Plaintiff's treatment

8  notes support Dr. Gold's findings, including that Plaintiff suffered from nerve damage and bone

9  spurs in her back."  (Doc. 17, pp. 10-11 (citing AR 429).)

10         The overall record, however, contradicts Dr. Gold's highly restrictive RFC assessment.

11  The agency consultative physicians both concluded Plaintiff was capable of light work (AR 62-63;

12  108-13) and aside from Dr. Gold's conclusory two-page opinion, no medical source opined

13  Plaintiff could not work.  The record also demonstrates that Plaintiff repeatedly declined or

14  quickly abandoned any treatment beyond narcotic pain medication (*see* AR 253 (declining Dr.

15  Aggarwal's recommendation of physical therapy and stating she 'want[ed] to continue with

16  conservative treatment"); 341 (noting Plaintiff's treatment plan was to be managed by pain

17  medications "only"); 347-54 (Plaintiff had one cervical transforaminal epidural steroid injection

18  before discontinuing injections); 355 (declining Dr. Aggarwal's repeated recommendation of

19  physical therapy); 580-83 (attending eleven biweekly sessions of physical therapy with some relief

20  with use of a traction unit before abandoning therapy without explanation), and repeatedly stated

21  that her pain is adequately controlled by use of pain medication (*see* AR 24-25; 402; 448-61

22  (reflecting Plaintiff's pain was adequately controlled by medication)).  Contrary to Plaintiff's

23  contention, her objective imaging studies demonstrating mild to moderate degenerative change at

24  multiple levels of her cervical and lumbar spine (*see* AR 562-63; 565) do not support Dr. Gold's

25  conclusory opinion that Plaintiff is incapable of full-time work at *any* exertional level (*see*

26  AR 606-07) when viewed in light of a record demonstrating Plaintiff's history of conservative

27  treatment and effective control of her pain symptoms with medication and heating pads (*see*

28  AR 43).

Plaintiff also contends the ALJ improperly relied on a single treatment note by Plaintiff's pain specialist in August 2009 when Plaintiff elected to continue a more conservative treatment regimen, even though the record demonstrates that Plaintiff attempted "every treatment available to her including physical therapy, injections, heat, and pain medications."  (Doc. 17, p. 11 (citing AR 42-43; 434; 442; 580).)  This does not accurately state the record.

Plaintiff twice declined physical therapy (AR 253; 355), abandoned steroid injection treatments after one attempt (AR 347-54) and physical therapy after eleven biweekly sessions (AR 580-83) even though she obtained some relief from her symptoms (AR 424), and has otherwise exclusively relied on narcotic pain medications to control her symptoms (AR 24-25; 402; 448-61). This conservative treatment history does not support Dr. Gold's conclusory opinion that Plaintiff is incapable of full-time work at *any* exertional level.  (*See* AR 606-07.)

Plaintiff also contends the ALJ erred in rejecting Dr. Gold's opinion as being based on Plaintiff's subjective complaints, which, as discussed above, the ALJ properly discredited. (Doc. 17, p. 9 (citing AR 26).)  While a physician can, with firsthand impressions and clinical evidence, give credence to a claimant's subjective claims, *Ryan*, 528 F.3d at 1199-1200, as discussed above, Dr. Gold's opinion is bereft of these necessary firsthand impressions and clinical evidence.  To the extent Dr. Gold's opinion *was* based upon Plaintiff's subjective complaints, the ALJ permissibly rejected Dr. Gold's opinion because Plaintiff's testimony had already been properly discounted as incredible.  *Tommasetti*, 533 F.3d at 1041 (citing *Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999)).  Further, because the ALJ properly discredited Dr. Gold's opinion on other permissible bases, to the extent Dr. Gold's opinion *was not* based upon Plaintiff's subjective complaints, any error in discrediting Dr. Gold's opinion on that basis is harmless.  *See Carmickle*, 553 F.3d at 1162 (an error is harmless where there "remains substantial evidence supporting the ALJ's conclusions on . . . credibility and the error does not negate the validity of the ALJ's ultimate [credibility] conclusion") (internal citation and quotations omitted) (alteration in original).

Plaintiff finally contends the ALJ improperly discredited Dr. Gold's opinion as inconsistent with Plaintiff's admitted activities of daily living.  (Doc. 17, p. 11 (citing AR 26).)

Plaintiff asserts the ALJ failed to explain with specificity which activities Plaintiff engaged in were inconsistent with Dr. Gold's opined limitations.  (Doc. 17, p. 11.)  While Plaintiff is correct that the ALJ did not articulate which specific activities he found to be inconsistent with Dr. Gold's opined highly restrictive limitations, this error was harmless.  *See Carmickle*, 533 F.3d at 1162 (holding that an ALJ's error is harmless so long as substantial evidence supports the ultimate conclusion).

In sum, substantial evidence within the record supports the ALJ's rejection of Dr. Gold's assessment as brief and conclusory in form "with little in the way of clinical findings to support the conclusion that appellant was totally disabled." *Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1988).

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of this Court is DIRECTED to enter judgment in favor of Carolyn W. Colvin, Acting Commissioner of Social Security, and against Plaintiff Candace Kessler.

IT IS SO ORDERED.

Dated:   __May 10, 2016__                              _____ **/s/ Sheila K. Oberto**
                                                                    UNITED STATES MAGISTRATE JUDGE